**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| | : | CRIMINAL CASE NO. |
| UNITED STATES OF AMERICA | : | 3:13-CR-00041 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID BRYSON et al., | : | |
| Defendants. | : | APRIL 1, 2015 |

**RULING RE: LOSS CALCULATION**
**AND OTHER SENTENCING GUIDELINE § 2B1.1 ISSUES**

On May 21, 2014, defendants David Bryson ("Bryson"), Bart Gutekunst

("Gutekunst"), and Richard Pereira ("Pereira") pled guilty to Count One of the Second

Superseding Indictment, conspiracy to commit wire fraud in violation of section 371 of

title 18 of the United States Code.   The court assumes familiarity with the underlying

facts of the case and with the issues set forth in its prior Ruling re: Findings of Fact,

United States v. Bryson et al., 3:13-cr-0004-JCH (Jan. 12, 2015) (Doc. No. 353)

("Ruling").   Still at issue in relation to sentencing, and the subject of the present ruling,

are 1) whether the court should include additional investors in its loss calculation, 2)

whether investors who invested prior to the conspiracy that began in March 2008

should be included in the loss calculation, 3) determining a reasonable estimate of the

loss attributable to the offense conduct, and 4) whether a two-level enhancement for

the use of sophisticated means is appropriate.

## I.      LOSS CALCULATION

### A.      Additional Post-March Investors

Based on its consideration of the additional evidence submitted by the government and defendants, as well as the record as a whole, the court determines that it is appropriate to include seven additional investors as victims for the purposes of its loss calculation, based on its finding that these investors invested on the basis of misrepresentations made by the defendants or at their direction.    For each of these investors, and for substantially the same reasons as those discussed in the court's prior Ruling, Ruling at 6-7, these acts and omissions were within the scope of the defendants' agreement, and foreseeable to the defendants; thus all three defendants are accountable for any resulting losses.

### 1.      AA Partners

AA Partners invested $10.2 million in the Cayman Fund after the conspiracy began.    The investments were made from June 6, 2008 through August 1, 2008. Prior to investing, AA Partners received the Organizational Chart that omitted the Bermuda Fund on two different occasions in April 2008.    Government's Memorandum in Aid of Sentencing (Doc. No. 356) ("Gov't Mem."), Exh. Tab 4 (Doc. No. 356-4). The court has already determined that this chart materially misrepresented the structure in which new investors would be investing.    See Ruling at 5-7.    AA Partners representatives also met with Joe Tremblay in Mid-April.    In May 2008, AA Partners, along with all other investors, received an email from Tremblay containing a "New Stream Fact Sheet," which stated that New Stream was "currently open to new investments through the feeder structure launched on 1 December 2007," without

reference to the Bermuda Fund or to the fact that the plan launched in December 2007 had been materially altered in March 2008.   G. Exh. 66.

Given the evidence the court has previously credited regarding New Stream's marketing strategy, Ruling at 6-7, the court finds that this evidence is sufficient to conclude that the representations made to AA Partners were misleading in that they did not include the Bermuda Fund, and that the information not disclosed was material. There is no evidence in the record that contradicts this conclusion,[1] or that suggests that the existence and seniority of the Bermuda Fund was ever disclosed to AA Partners prior to their investments being made.

2.      Atlas

Atlas Capital Group ("Atlas") invested $6.15 million between April 1, 2008 and September 1, 2008.   On March 25, 2008, while New Stream was in the process of amending the Collateral Agency Agreement, Notes, and Note Purchase Agreements to reflect Bermuda's continued seniority in the capital structure, Tremblay emailed Atlas representative Sean Coleman regarding a potential off-shore investment without reference to the changes that had taken place following the Gottex meeting.   Gov't Mem., Exh. Tab 1 (Doc. No. 356-1) at 8.   On April 28, 2008, Atlas analyst Frederic Hevras had a conference call with David Bryson.   Hevras's notes from the call indicate that Bryson informed him the fund had received redemptions totaling 100 million "from some funds of funds (Eden Rock and Pentagon) . . . but some inflows as well so the net impact will be smaller."   Id.   This statement misrepresented the amount of

---

[1] After the government came forward with additional evidence, the court gave the defendants the opportunity to rebut it.

redemptions New Stream was facing.   At the time of the call, Gottex had already placed its $300 million plus redemption.   There is no evidence that Bryson informed Hevras about the continued existence and seniority of the Bermuda Fund during the April 28 call, and Atlas internal records do not reference the Bermuda Fund until March 2009.   Gov't Mem. Exh. Tab 1 (Doc. No. 356-1) at 2, 12.   Atlas also received Tremblay's "New Stream Fact Sheet" email in May 2008.   G. Exh. 66.   In an interview with Special Agent Allen, representative Richard Morgan stated that the information that Atlas would be junior to $300 million of investments would likely have prohibited any investment by Atlas.   Id. at 1.   Sean Coleman stated that Atlas knew there was a large fund of funds invested with New Stream, but believed that it was invested in the same structure as Atlas and had the same terms (pari passu) as Atlas.   Id. at 2.   He further provided that, if Atlas had known the Bermuda Fund was senior to its position, there is an "infinitesimally small chance" Atlas would have invested at all.   Id. at 3.

Defendants argue that the evidence presented by the government is misleading in that it overlooks New Stream's long history of communications with Atlas, and that Atlas representatives were clearly aware of the Bermuda Fund's existence prior to the restructuring, including having received information about the Bermuda Fund in June 2007.   Defendants' Supplemental Memorandum Regarding Loss Calculation ("Def.'s Supp. Mem.") (Doc. No. 366) at 3.   However, the court views this as irrelevant to the question of whether Atlas was aware of Bermuda's continued existence and seniority following the onset of defendants' conspiracy.   Like all investors, Atlas was told in November 2007 that the Bermuda Fund was closing.   In fact, in late January 2008, Hevras was told by David Bryson that the transfer to the new structure was "almost

completed."   Gov't Mem., Exh. Tab 1 (Doc. No. 356-1) at 7.   There is no evidence in the record to contradict the conclusion that the decision to retain Bermuda as senior in March 2008 was not disclosed to Atlas, or that Atlas was not otherwise aware of Bermuda's continued existence and seniority.   Thus, the evidence is sufficient for the court to infer that misrepresentations were made to Atlas, and that Atlas invested on the basis of those misrepresentations.

3.   Auda Advisor Associates LLC

Auda Advisor Associates LLC ("Auda") invested $3 million in the Cayman Fund in August 2008.   In May 2008, Auda received the "New Stream Fact Sheet" and email stating that the fund was open to new investments "through the feeder structure launched on 1 December 2007."   In June 2008, in response to a question from Auda regarding leverage, Tremblay responded that "to date we have not felt the need to use leverage on any of our asset classes . . ." Gov't Mem. Exh. Tab 7 (Doc. No. 356-7).   As discussed in the court's previous Ruling, Ruling at 5-6, these statements were misleading.

Defendants argue that Auda must have been aware of the existence of the Bermuda Fund based on Tara Bryson's deposition testimony that, at some point in late 2007 or early 2008, she described the Bermuda Fund to Auda as a leverage provider in explaining how the new structure "came to be," Def.'s Supp. Mem. Exh. K (Doc. No. 366-11), and thus that Tremblay's response was not misleading since Auda was already aware of the Bermuda Fund.   However, at the time this statement was made, the plan was still that the Bermuda Fund "was going away," as Auda and all other investors were told.   Thus, it does not indicate that Auda was aware that, after the

5

March Gottex meeting, the defendants had decided to maintain the Bermuda Fund as senior in the new fund structure, and that any investments in the new structure would be subject to approximately $400 million of leverage.   Thus, the evidence is sufficient for the court to find that misrepresentations were made to Auda, and that Auda invested on the basis of those misrepresentations.

   4.   Harcourt

   Harcourt Investment Consulting invested $750,000 in the Cayman Fund on June 1, 2008.   Harcourt had formerly been invested in the Bermuda Fund and had been told in January 2008 that all previous investments "should be transferred into the new structure so that all investors are pari passu" and that "New Stream would ideally like to have all transfers completed no later than March or April."   Gov't Mem. Exh. Tab 5 (Doc. No. 356-6).   On March 18, 2008, the day after the Gottex meeting, Tara Bryson emailed Harcourt representative Olya Klüppel, copying Gutekunst, with responses to questions about redemptions and leverage.   Bryson's response did not reference the Bermuda Fund or Gottex's redemptions.[2]   In May 2008, Harcourt, along with all other investors, received an email from Tremblay containing a "New Stream Fact Sheet" stating that New Stream was "currently open to new investments through the feeder structure launched on 1 December 2007," without reference to the Bermuda Fund.   G.

---

[2]  The defendants argue that Gottex's redemptions had not yet been placed, pointing to Amy Lai's testimony that they submitted redemptions at "the end of March 2008." Amy Lai Testimony, Tr. 303:12-13. However, Lai also first testified that, "after the [March 17] meeting, we immediately submitted redemptions," and in an internal email on the afternoon of March 18, 2008 refers to "the redemptions we submitted."   G. Exh. 38.   The court understood the reference to "end of March" as the time when the 120-day redemption clock would start, not the day the redemption was submitted.

   At a minimum, Tara Bryson was aware of Gottex's intent to redeem its entire investment at the time she emailed Harcourt on March 18, 2008.

Exh. 66.

Defendants argue that Harcourt could not have been misled, as Tara Bryson's January 2008 email to them indicates that Harcourt was aware both that the Bermuda Fund was senior and that it might not be closed by March or April.   The first argument is called into doubt by Tara Bryson's deposition testimony, in which she indicated that the "mismatch in seniority" referred to the fact that the U.S./Cayman structure had an equity component, and that she had "absolutely" told Klüppel that the debt in the U.S./Cayman funds was pari passu to that in the Bermuda Fund.   Government's Reply to the Defendant's Memorandum Regarding Loss Calculation ("Gov't Rep.") (Doc No. 368) Exh. C (Doc. No. 368-3).   More important, evidence of what Harcourt was told prior to the onset of the conspiracy is not illustrative of whether Harcourt was aware that, once the conspiracy began, defendants abandoned the original plan advertised to investors and decided to retain the $400 million-plus Bermuda Fund as senior in the capital structure.   Before Harcourt's June 2008 investment, it was told the Fund being offered was the one announced in December 2007, which was a fraudulent statement. There is no evidence to the contrary.   The evidence supports the court's finding that Harcourt was induced to invest in June 2008 on the basis of misrepresentations made by defendants.

5.    Walter Schwab

Walter Schwab invested $500,000 in the U.S. Fund on April 1, 2008.   Schwab dealt primarily with Pereira.   In interviews with Special Agent Allen, he stated that Pereira "misled" him and that he did not recall being told that some New Stream funds were subordinate to others.   Gov't Mem. Exh. Tab 3 (Doc. No. 356-3).   Given the

evidence the court has already credited regarding New Stream's marketing strategy – in short, that the fund was marketed to investors as if the Bermuda Fund did not exist after the Gottex meeting – and the lack of any evidence to the contrary, the court finds that Schwab invested on the basis of misrepresentations made to him by Pereira.

6.     Stillwater

Stillwater Capital Partners Inc. ("Stillwater") invested $730,000 in the Cayman Fund on May 1, 2008, and invested $500,000 in the U.S. Fund on July 1, 2008. Stillwater's relationship with New Stream during the relevant period was handled by Stillwater employee Bella Borg-Brenner.   A Report of Interview conducted by Special Agent Lynn E. Allen with Borg-Brenner states that Borg-Brenner provided the following information: that Stillwater was not aware that their position was junior, that Stillwater would not have invested if they knew their investment was junior to $300 million of other investments, that New Stream specifically told Borg-Brenner that there was no leverage in the Cayman Fund, and that Borg-Brenner was not told that other investors were allowed to move to a senior position in New Stream's funds.   Gov't Mem. Exh. Tab 2 (Doc. No. 356-2) at 1.   Stillwater also received the "New Stream Fact Sheet" email in May 2008, which did not mention the Bermuda Fund or the fact that the fund structure had been altered from the plan launched in December.   G. Exh. 66.

Defendants again argue that Stillwater must have been aware of the Bermuda Fund, because their investments with New Stream began prior to the launch of the new structure, at a time when only the U.S. Master Fund and the Bermuda Fund were available.   Def. Supp. Mem. at 6.   As stated previously, the court views this as irrelevant to whether Stillwater was aware of Bermuda's continued existence and

seniority after the March 17 Gottex meeting and before Stillwater decided to invest in May and July 2008.   There is nothing in the record to contradict Borg-Brenner's statements that Stillwater was not aware their position was junior, or that the Bermuda Fund was not disclosed as leverage.   The evidence of record is sufficient for the court to find that misrepresentations were made to Stillwater, and that Stillwater invested on the basis of those misrepresentations.

      7.     Stone Corporation/ESD Holdings

ESD Holdings invested $4 million in the Cayman Fund from August 2008 – September 2008.   These investments were placed by Kermit Claytor of Kings Mountain Captial Group on behalf of his client, ESD Holdings.   Unlike some of the other investors, Claytor appears to have been aware that the Bermuda Fund still existed, as one of his clients retained an investment in the Fund at least through October 2008.   Def.'s Supp. Mem. Exh. H.   However, he told Special Agent Allen that, at the time of the investments, he was unaware that the U.S./Cayman investors were subordinate to the Bermuda Fund investors.   Rather, at the time he invested, he believed that, in a liquidation scenario, all funds would be treated pari passu with each other.   Had he understood that the U.S. and Cayman Funds were subordinate, he would not have recommended the U.S. and Cayman Funds to those investors.   Gov't Mem. Exh. Tab 6 (Doc. No. 356-6).   Claytor also received the "New Stream Fact Sheet" email in May 2008.   G. Exh. 66.

Defendants argue that Claytor's assertion that he was unaware that the U.S./Cayman Funds were subordinate is belied by the fact that his investors were invested in both the Bermuda Fund and the on-shore fund prior to the restructuring,

when the on-shore fund, as equity, was clearly subordinate to the Bermuda Fund, as debt.   Def.'s Supp. Mem. at 12.   They argue that, "after the restructuring, given his knowledge that the Bermuda Fund continued to exist, the different returns between the two investments, and that the U.S. and Cayman Funds held at least part equity, it would have been irrational for Mr. Claytor to believe that all investors were pari passu."   Id. The court disagrees.   As stated previously, the court views whether investors had knowledge of Bermuda's seniority prior to the restructuring as irrelevant to its consideration of whether they were misled following the Gottex meeting in March 2008.[3] Defendants further argue that an email sent by Claytor to Keith Harper in December 2009 indicates that he did not believe he was misled by New Stream.   Def.'s Supp. Mem. at 12-13.   However, after weighing the record as a whole, the court finds that the evidence is sufficient for the court to conclude that ESD Holdings invested on the basis of misrepresentations made regarding the junior status of the Cayman Fund in the fund structure.

---

[3]   The court further notes that, in announcing the new structure in November 2007, all investors were told that the new fund structure "ensures that all investors (U.S. and non-U.S.) will have the same risk-reward profile, the same portfolio exposures and the same pre-tax return." G. Exh. 12.   The court has already ruled that defendants did not intend to defraud anyone at the time this letter was sent, and that it accurately reflected their intentions at the time.   Defendants have further argued that the quoted statement was intended to describe the status of all investors once Bermuda had closed, not Bermuda's status in the interim.   However, multiple investors, whom the court found very credible, testified that they understood all investors to be on equal footing following the commencement of the new structure. Further, some Bermuda investors were explicitly told that they were pari passu – indeed, the events leading to the conspiracy were precipitated by Gutekunst's statement to that effect to Gottex.   Thus, even given the lack of direct evidence that Claytor was explicitly told the funds were pari passu, the court is unpersuaded by defendants' argument that his belief to that effect "would have been irrational" and thus should be discredited.

8.      Additional Investors

In addition to these eleven investors, four additional investors invested in the Cayman or U.S. Funds following the March 2008 Gottex meeting.[4]   The government again argues that the court should infer that these four investors were also fraudulently induced to invest based on defendants' misrepresentations of the fund structure.   In support of its position, the government points to the evidence regarding the other eleven investors that the court has found were fraudulently induced to invest, evidence that other potential investors were also provided with the misleading marketing chart, and to evidence the court has credited regarding New Stream's marketing strategy and the lack of disclosure in the financial statements.   Defendants argue that the court cannot draw this inference in the absence of specific evidence in the record relating to these four investors.   In support, they point to two occasions in which potential investors were informed about the Bermuda Fund, though neither of those investors made investments with the fund.   Defendants also argue that New Stream had no general "duty to disclose" the existence of the Bermuda Fund.

Other than the fact that at least some of the remaining four post-March investors appear to have received the May 2008 "New Stream Fact Sheet" email, there is no specific evidence in the record relating to these investors.   For substantially the same reasons set forth in its Ruling, the court declines to find that these four investors were fraudulently induced to invest.   See Ruling at 10-11.

---

[4]  Crescendo Capital SA invested a total of $7.68 million in the Cayman Fund from May 1, 2008 through Sept. 1, 2008; Select Access Management invested $1 million in the U.S. Fund on July 1, 2008; Arch Financial invested $2 million in the Cayman Fund on Sept. 1, 2008; and Finter Bank invested $2.5 million in the Cayman Fund on Dec. 1, 2008.

B.      Calculation of Loss under the Sentencing Guidelines

In calculating the sentencing guidelines applicable to the defendants, the court must only make a reasonable estimate of the loss attributable to their conduct. U.S.S.G. § 2B1.1 note 3(C).   Loss under the guidelines is defined as the greater of actual loss or intended loss.   Id., note 3(A).   Actual loss is defined as the reasonably foreseeable pecuniary harm that resulted from the offense; that is, pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.   Id., note 3(A)(i), 3(A)(iv).   Relevant conduct in determining the offense level includes all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, as well as all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.   U.S.S.G. § 1b1.3(a)(1).

1.      Post-March Investors

The government and the defendants have each presented a theory of loss calculation for the post-March investors that the court has determined were induced to invest by the defendants' fraud.   The government's view is that the loss attributable to the conspiracy is the entire amount of the investment.   They base this view on, among others, the Second Circuit's decisions in U.S. v. Turk, 626 F.3d 743 (2d Cir. 2010) and U.S. v. Paul, 634 F.3d 688 (2d Cir. 2011).   The government further argues that the amount received by the investors in the bankruptcy proceedings should not be deducted from the calculation of actual loss for the post-March 17 investors.

The defendants argue that the loss attributable to the conspiracy is the difference in value between what the victim investors invested in, namely a junior

position, and the value of what they thought they were investing in, namely a <u>pari</u> <u>passu</u> position.    Defendants' Memorandum Regarding Loss Calculation and Sophisticated Means ("Def.'s Mem.") (Doc. No. 355) at 5-6.    They base this position on, primarily, the Second Circuit's decisions in <u>U.S. v. Rutkoske</u>, 506 F.3d 170 (2d Cir. 2007), <u>U.S. v. Ebbers</u>, 458 F.3d 110 (2d Cir. 2006), and <u>U.S. v. Leonard</u>, 529 F.3d 83 (2d Cir. 2011), and the Tenth Circuit's decision in <u>U.S. v. Evans</u>, 744 F.3d 1192 (10th Cir. 2014). They argue that a reasonable estimate of that loss is the difference between what the victim investors recovered in New Stream's bankruptcy and what they would have recovered had all investors been treated as <u>pari</u> <u>passu</u> in the bankruptcy.    Def.'s Mem. at 5-6.    They further argue that <u>Turk</u> and other cases are distinguishable in that they dealt with fraudulently obtained loans, whereas the case at hand involves an equity investment, in which the investor intends to take on the risks and benefits of the market. Finally, they argue that, if the court rejects this view, it must at minimum deduct the amount received by the victim investors in bankruptcy when calculating the actual loss amount.    Def.'s Mem. at 12-13.

It is the court's view that for those investors who were fraudulently induced to invest following the onset of the conspiracy, a reasonable estimate of the actual loss attributable to the offense conduct is the total value of their investment.    <u>See</u> <u>Turk</u>, 626 F.3d at 750 ("without [defendant's fraudulent conduct], [defendant] could not have obtained her victim's money.    It follows that a potential direct result of [defendant]'s specific fraudulent act was the total loss of the moneys the individual investors had given her."); <u>U.S. v. Byors</u>, 586 F.3d 222 (2d Cir. 2009); <u>U.S. v. Hsu</u>, 669 F.3d 112 (2d Cir. 2012); <u>U.S. v. Komar</u>, 529 F. Appx. 28, 29 (summary order).    For these investors,

the defendants obtained their investments by misrepresenting the fund structure in which they would be investing – that is, these investors were fraudulently led to believe that they were investing in a structure where all investors were <u>pari passu</u>, when in reality, they were investing in a position junior to over $300 million of senior debt. These investors did not intend to take on the "risks and benefits of the market" associated with a junior investment; rather, the investment they thought they were making was fundamentally and materially different than what they actually received.[5] The loss to these investors was caused not by the decline in value of New Stream's funds, but by their having invested in the first place.   See <u>Paul</u>, 634 F.3d at 677 ("the loss . . . was not caused by the decline in value of SLM stock, but rather, by the making of the loans in the first instance.").   If the defendants had not fraudulently induced these investors to invest in the U.S. and Cayman Funds, they would not have been exposed to the market risks of those investments.   See <u>U.S. v. Stitsky</u>, 536 F. Appx. 98, 112 (2d Cir. 2013) (summary order) ("the district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because . . . investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first place").

Further, this loss was foreseeable to defendants.   These investors were

---

[5] In this sense, this case is distinguishable from <u>Evans</u>, where the Tenth Circuit held that the district court had to account for the effect and foreseeability of non-fraud factors on the value of the securities involved in that case.   In declining to follow <u>Turk</u>, the Tenth Circuit found that the investors' interests in <u>Evans</u> "were akin to equity" and noted that "[t]hough the certificate holders were promised eventual repayment, they were also promised extraordinary returns predicated on the success of the underlying properties, <u>with disclosure of the associated and substantial risk factors</u>."   <u>Evans</u>, 744 F.3d at 1197-98 (emphasis added).   In <u>Evans</u> there was also no fraud in the inducement of the investments.   <u>Id.</u> at 1196.

fraudulently induced to invest in a junior position by the defendants.    Inherent in this junior status was the risk that they would suffer a loss of their entire investment in a liquidation scenario in which priority was given to the senior investment.    However, the victim investors were unaware of that risk, because they had been led to believe their investments were pari passu.    In Turk, the defendant fraudulently obtained investments by leading investors to believe that they were secured creditors when in fact they were unsecured.    The Second Circuit noted:

> [B]y definition, a potential result of being an unsecured creditor is the loss of one's interest to the higher-priority interests of secured creditors. That potential result is unremarkable if the unsecured creditors extend credit with full knowledge that they bear the risk of total loss, but the crux of [defendant]'s offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors.    Without this deceit, she could not have obtained her victim's money.    It follows that a potential direct result of [defendant]'s specific fraudulent act was the total loss of the moneys the individual investors had given her. That is enough to constitute 'reasonably foreseeable pecuniary harm.'

> Turk, 626 F.3d at 750 (emphasis added).

Similarly here, a potential result of the defendant's fraudulent conduct was the loss of the entire investment fraudulently induced, and this loss was foreseeable to defendants.

Finally, the amount received by the victim investors in bankruptcy should not be deducted from the principal invested in calculating actual loss for guideline purposes.[6] The Application Notes to the Guidelines list three types of "credits against loss" that serve to reduce the loss amount.    The first provides that loss shall be reduced by money returned to the victim before the offense was detected.    U.S.S.G. § 2B1.1 App. Note 3(E)(i).    The second and third types relate to cases involving collateral pledged or

---

[6] The amounts received in bankruptcy will likely affect restitution amounts.

otherwise provided by the defendant.   Id. 3(E)(ii), (iii).   None of these categories appears to apply to funds received in bankruptcy after the conspiracy was uncovered, or to the potential value of a future bankruptcy payout.   See Komar, 529 F. Appx. at 29 ("the application notes to § 2B1.1 . . . significantly omit any direction to apply the value of an equity stake as a credit against actual loss . . . the Sentencing Commission knows how to provide for an offset against actual loss, but has chosen not to do so [in these circumstances").   At the time the fraud was uncovered, the investors had received nothing of value.[7]   See Stitsky, 536 F.Appx. at 112 (2013).

Based on the foregoing, a reasonable estimate of the loss to the post-March investors (including the seven discussed above and the four discussed in the court's prior Ruling) who were fraudulently induced to invest is the total value of their investments, namely, $40,980,000.

2.      Pre-March Investors

The court has previously found that, after the onset of the conspiracy in March 2008, misrepresentations were made to investors who had invested in December 2007. Ruling at 13-17.   Unlike the post-March investors, these investors were not induced to invest by these misrepresentations: they were already invested in the U.S. or Cayman Fund at the time that the misrepresentations were made.   Defendants argue that, as a

---

[7]  The court also notes that any loss that is greater than $20 million but not greater than $50 million falls within the same guideline range.   U.S.S.G. § 2B1.1(b)(1)(L).   As discussed infra, the court has determined that the actual loss resulting from the offense falls within this range.   Deducting the amount received so far in bankruptcy proceedings does not lower the actual loss amount to $20 million or below, so it would not affect the guideline range.

result, no loss can be attributed to these misrepresentations.    In its prior Ruling, the court noted that, even if these investors had submitted redemptions at the time a particular misrepresentation was made, there was no guarantee they would have received a payout prior to the shuttering of the fund in October 2008, and having a pending redemption would not have affected their eventual recovery.    Id. at 17-18. However, it invited the government to brief its theory of loss with regard to the pre-March investors.

At the invitation of the court, in its subsequent memorandum and at oral argument, the government presented a theory of loss based not on the specific misrepresentations found by the court, but rather, on the loss resulting from "acts taken in furtherance of the conspiracy."    The government argues that, notwithstanding any particular misrepresentation made after the conspiracy began, all of the investors who made new investments in the U.S. or Cayman Funds beginning in December 2007, but prior to March 17, 2008, suffered loss as a result of the conspiracy.    They argue that the decision to retain the Bermuda Fund as senior in the capital structure, the execution of the amended Collateral Agency Agreement, Notes, and Note Purchase Agreements – all of which established Bermuda as senior to the U.S./Cayman investments – and the decision to allow Gottex and other investors to stay in the Bermuda Fund in order to avoid paying redemptions, were all acts taken in furtherance of the conspiracy, and as a result of these acts, the pre-March investors suffered a loss related to their junior status.    The government further argues that the loss attributable to these acts is the total value of the investments, because that is the amount put "at risk" by the acts taken in furtherance of the conspiracy.    Gov't Mem. at 13.

The court agrees that the acts described by the government are properly considered under the guidelines as acts taken in furtherance of the conspiracy and thus relevant conduct, and therefore that any loss resulting from these acts should be included in the guideline calculation.   Further, these acts affected all of those investors who invested in the U.S./Cayman Funds between December 2007 and March 18, 2008, regardless of whether misrepresentations were made to them after the fact.   However, the court disagrees that the loss resulting from those acts was the entire investment. Unlike the post-March investors, this group of investors was not fraudulently induced to invest.   The government's contention that "each investor would have received all or a substantial portion of their investment through a dissolution in which they would have been treated as pari passu," Gov't Mem. at 15-16, is not supported by the record.[8] With regard to this group of investors, the result of the defendants' acts taken in furtherance of the conspiracy was that their investments, which were intended to be pari passu, were instead established after the fact of investment as junior to $400 million plus of senior investments once the decision was made to retain the Bermuda Fund. The foreseeable loss that resulted from the conspiracy is thus the difference in value between the investments had they been pari passu and the junior investments.

While neither party has provided an estimate of this loss for the pre-March investors, the defendants have presented a calculation for the post-March investors arguing that the "change in value" from a pari passu investment to a junior investment is

---

[8] Amy Lai testified that some of Gottex's Bermuda Fund investments, which were senior, received only 13.5 cents on the dollar and that, while one fund received almost 90 cents on the dollar, Gottex received under 20 cents on the dollar in total on its Bermuda investment.   Amy Lai Testimony, Tr. 322:7-15.

a 12% reduction in value.[9]   The court thus concludes that a reasonable estimate of the loss to pre-March investors is 12% of their total investment.   See Def.'s Supp. Mem. at 24-28.   Based on the total amount of new investments between December 1, 2007 and March 1, 2008, Gov. Exh. 119, this results in a loss amount of $5,644,800.[10] Thus, the estimated total loss amount for both groups of investors is $46,624,800, resulting in a 22-level increase under the Guidelines.[11]

---

[9]  This calculation was based on the percentage recovery in bankruptcy if all investors had been treated as pari passu compared to the percentage recovery with the U.S./Cayman investors as junior. See Def.'s Supp. Mem. at 24-28. The defendants based their percentage recovery and amount of total claims on the "Treatment of Claims and Interests" attached as Exh. B in New Stream's "Second Amended Disclosure Statement in Connection with the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code."   Def.'s Memo. Exh. 2 (Doc.. No. 355-2).   At oral argument, the government contested this calculation and argued that the difference in recovery was actually 26%. The government based this argument on a calculation of total U.S/Cayman claims as approximately $360 million, a number cited in the Disclosure Statement as the "aggregate indebtedness" to the U.S./Cayman Funds and the Bermuda Non-C, F, and I classes. Def.'s Memo. Exh. 1 (Doc.. No. 355-1) at 65.   However, the government used the same numbers for estimated recovery and percentage recovery that the defendants used.   The government also did not express what amount of the total represented U.S./Cayman claims versus Bermuda claims, though they had previously submitted documentation listing the total U.S./Cayman claims as approximately $178 million. Gov't Mem. Tab 9 (Doc. No. 356-9), New Stream Liquidation Trust Beneficiaries dated 1/26/2015.   In response to the government, the defendants submitted a "Liquidation Analysis" prepared in conjunction with the Reorganization Plan that includes total figures for U.S./Cayman claims and Bermuda Non-C, F and I classes that roughly track the defendants' original estimates.   Def.'s Supp. Mem. Exh. L (Doc. No. 366-12) at 7.

The court recognizes that the defendants' numbers were projections and do not represent actual recovery.   However, they provide the court with a reasonable mechanism to assess how the U.S./Cayman investors' junior status affected their recovery.   Bearing in mind that the court is tasked only with providing a "reasonable estimate" of loss for the purpose of determining the guidelines, the court concludes that the calculation provided by the defendants is reasonably supported and consistent with the record as a whole, and that 12% is a reasonable estimate of loss in value resulting from the junior status of the investments.

[10]  This figure is based on total new investments of $47,040,000 to the U.S./Cayman Funds during that time period.   The court notes that a more exact calculation would use the values of these investments as of March 18, 2008 as the start value; however, neither side has provided this value. Further, this would only affect the applicable guideline range if the value increased substantially during those three and a half months, and there is no indication in the record that this occurred.   The court's job is to provide its best estimate of the loss resulting from the defendants' conduct.

[11]  A 22-level increase applies when the loss is more than $20 million but not more than $50 million.   U.S.S.G. § 2B1.1(b)(1)(L).

## II.     VICTIM ENHANCEMENT

Given the foregoing findings regarding loss calculation, the court concludes that a two-level increase for offenses involving ten or more victims is appropriate.   U.S.S.G. §2B1.1(b)(2)(A)(i).

## III.     SOPHISTICATED MEANS ENHANCEMENT

Finally, the defendants oppose the application of a sophisticated means enhancement under § 2B1.1(b)(10), which would add two levels to their offense conduct.   They argue, essentially, that although the structure of New Stream was itself complex, there was nothing especially complex or intricate about the offense conduct. Def.'s Mem. at 16.

The Application Note to § 2B1.1(b)(10) defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[12]   USSG § 2B1.1 App. Note. 9(B).   A sophisticated means enhancement is appropriate where the offense conduct, viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme.   U.S. v. Jackson, 346 F. 3d 22, 25 (2d Cir. 2003); see also U.S. v. Cole, 296 F. App'x 195, 197 (2d Cir. 2008) (summary order).

The government argues that the defendants' offense conduct warrants a sophisticated means enhancement based upon, among others, the length of the

_____

[12]  The Guideline Notes give several examples of conduct that would indicate sophisticated means, stating that "for example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 App. Note. 9(B).

conspiracy, including the fact that some investors were unaware of the Bermuda Fund's continued existence until 2009 or 2010; that the defendants used false marketing materials and misleading or false documents; that the defendants executed the Collateral Agency Agreement to appease Gottex while withholding it from other investors; that the defendants concealed the U.S./Cayman Funds' subordinate status in the 2007 Financial Statements by not including as a "subsequent event" the decision to retain the Bermuda Fund as senior; and that the defendants made use of legitimate professionals at J.H. Cohn and Reed Smith to conceal their conspiracy to commit fraud. Gov't Mem. at 27-30.   The government also argues that the defendants engaged in continued efforts to conceal the conspiracy by utilizing attorney-client privilege.   Id.

The court concludes that a sophisticated means enhancement is warranted in this case.   The Second Circuit has upheld use of the sophisticated means enhancement in, among others, a case involving investment fraud where the scheme "(1) lasted several years; (2) reflected very careful planning; (3) included a careful effort to conceal the fraud by lying to business partners, lawyers, and investors; (4) relied on creating and disseminating marketing publications that contained material misrepresentations; and (5) involved the creation of fictitious documents for the purpose of convincing investors to give money or not to redeem their money from [the company]." U.S. v. Stitsky, 536 F. Appx. 98, 112 (2d Cir. 2013) (summary order).

In this case, defendants concealed their conspiracy for over a year.   The conspiracy involved carefully orchestrated communications with investors involving multiple people.   See, e.g., Ruling at 6-7.   Defendants created and marketed the funds with materials that contained misrepresentations of the fund structure.   Id.

21

They further created financial statements that did not accurately reflect the status of the fund when issued, and strategically withheld certain documents from their independent auditor in creating those statements.    Ruling at 11-13, Jay Levy Testimony, Tr. at 968-970.    Even when investors began asking direct questions about the Bermuda Fund and/or seniority and leverage, defendants continued to conceal their conspiracy by representing to investors that complete disclosure had been provided and that any "misunderstandings" were the investor's own.    E.g., Tricia Ward Testimony, Tr. at 1041:21 – 1044:7.    The offense conduct, viewed as a whole, is far removed from a "garden variety fraud," and is "especially complex or especially intricate."     It thus warrants a sophisticated means enhancement.

## IV.    CONCLUSION

Based on the foregoing, the court determines that the offense level applicable to all three defendants under § 2B1.1 of the guidelines is 32.[13]   This total results from a base offense level of 6 under §2B1.1(a)(2), plus a 22 level increase for a loss amount greater than $20 million but not greater than $50 million under § 2B1.1(b)(1)(L), plus a two level increase for an offense involving 10 or more victims under § 2B1.1(b)(2)(A)(i), plus a two level increase for an offense involving sophisticated means under § 2B1.1(b)(10)(C).

---

[13]  The court has not yet determined adjustments under Chapter Three of the Guidelines.

**SO ORDERED.**

Dated this 1st day of April, 2015 at New Haven, Connecticut.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge